**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| THOMAS RIEDY, as Personal Representative of Gerald Riedy, deceased, | Case No. 1:24-cv-498 |
| *Plaintiff,* | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| *Defendant.* | |

Plaintiff Thomas Riedy, in his capacity as son and Personal Representative of Gerald Riedy, deceased, brings this Complaint and Demand for Jury Trial ("Complaint") against Defendant National Collegiate Athletic Association ("NCAA") to obtain redress for Gerald Riedy, who was injured and died as a result of Defendant's reckless disregard for his health and safety as a student-athlete. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## INTRODUCTION

1.      Nearly one hundred thousand student-athletes sign up to compete in college football each year, and it's no surprise why. Football is America's sport and Gerald Riedy and football players like him were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching the game. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each game, these players—often mere teenagers—are riled up and told to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going.

2.      However, for years Defendant has kept players like Gerald Riedy and the public in the dark about an epidemic that was slowly killing college athletes—and then, as the epidemic

barely began to come to light, failed to take adequate steps to manage it.

3.      During the course of a college football season, athletes absorb more than 1,000 impacts greater than 10 Gs (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20 Gs, with some approaching 100 Gs. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and weren't wearing a seatbelt, the force of you hitting the windshield would be around 100 Gs. Thus, each season these eighteen (18), nineteen (19), twenty (20), and twenty-one (21)-year-old student-athletes are subjected to repeated car accidents.

4.      Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long-term brain injuries, including memory loss, dementia, cognitive impairment, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological events that could slowly strangle their brains.

5.      For decades, Defendant NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.      While in school at Pepperdine University ("Pepperdine") and later California State University, Long Beach ("Cal State Long Beach"), football players like Gerald Riedy were ultimately under Defendant's care. Unfortunately, Defendant did not care about the off-field consequences that would haunt students, like Gerald Riedy, for the rest of their lives.

7.      Despite knowing for decades of a vast body of scientific research describing the dangers of concussive and sub-concussive impacts like those Gerald Riedy experienced, Defendant failed to implement adequate procedures to protect Riedy from the long-term dangers associated with them. It did so knowingly and for profit.

8.      As a direct result of Defendant's acts and omissions, Gerald Riedy suffered brain and other neurocognitive injuries from playing NCAA football, culminating in his death and his

diagnoses of dementia and Stage II Chronic Traumatic Encephalopathy.

9.       As such, Plaintiff brings this Complaint in order to vindicate Riedy's rights and hold the NCAA accountable for its acts and omissions.

## PARTIES

10.      Plaintiff Thomas Riedy brings this action as the son of and Personal Representative of Gerald Riedy, who is deceased. Thomas Riedy is a citizen of the State of Arizona, and Gerald Riedy was a citizen of the State of Arizona when he died.

11.      Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of Indiana pursuant to 28 U.S.C. § 1332(d)(10).

## JURISDICTION AND VENUE

12.       This This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the jurisdictional amount exceeds $75,000, Plaintiff is a citizen of California, and the NCAA is a citizen of Indiana.

13.       Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated from this District, and because Defendant NCAA resides here.

## FACTUAL BACKGROUND

**I.    Defendant Had A Duty To Protect Student-Athletes, Including Gerald Riedy.**

14.      The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including the football programs at Pepperdine and Cal State Long Beach. According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest

in improving the experiences of athletes—on the field, in the classroom, and in life."

15.     The NCAA brings in more than $750 million in revenue each year and is the most significant college sports-governing body in the United States.

16.     To accommodate the wide spectrum of athletes at its member schools, the NCAA has three different divisions of intercollegiate competition.

17.     Each NCAA division is composed of several "conferences" to facilitate regional league play.

18.     Pepperdine previously had an NCAA Division I football program in the California Collegiate Athletic Association conference, but discontinued the program in 1961: Gerald Riedy's first and last year at the school.

19.     Cal State Long Beach previously had an NCAA Division I football program in the Big West conference, until 1991 when the program was discontinued.

20.     Defendant played a significant role in governing and regulating these football programs and owed a duty to safeguard the well-being of its participating student-athletes.

21.     Since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

22.     As such, the genesis of the NCAA was for a singular goal: "to keep college

---

[1]     *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited March 18, 2024).
[2]     In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

athletes safe."[3]

23.    According to the NCAA, "[c]ollege and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletics administrators, faculty and student-athlete representatives [while each] division creates its own rules that follow the overarching principles of the NCAA."[4]

24.    The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for student-athletes[;]
>
> (b)  To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1 § 1.2(a)(b).

25.    The NCAA Constitution also defines one of its "Fundamental Polic[ies]" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the infractions process of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1 § 1.3.2.

26.    Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being[,]" and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. (Revised: 11/21/05[.])

---

[3]    *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety (last visited March 18, 2024).

[4]    *Membership*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are/membership (last visited March 18, 2024).

### 2.2.3 Health and Safety.
It is the responsibility of each member institution to protect the
health of, and provide a safe environment for, each of its
participating student-athletes. (Adopted: 1/10/95[.])

27.     To accomplish this purpose, the NCAA promulgates and implements standard

sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and

Administrative Bylaws. These NCAA documents provide detailed instructions on game and

practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA

member institutions, including schools like Pepperdine and Cal State Long Beach, and NCAA

conferences are obligated to abide by the NCAA's rules and requirements. Specifically,

according to the NCAA Constitution: "Each institution shall comply with all applicable rules and

regulations of the Association in the conduct of its intercollegiate athletics programs . . .

Members of an institution's staff, student-athletes, and other individuals and groups representing

the institution's athletics interests shall comply with the applicable Association rules, and the

member institution shall be responsible for such compliance." NCAA Const., Art. 2 § 2.8.1.

28.     The NCAA publishes a health and safety guide termed the Sports Medicine

Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's

official policies and guidelines for the treatment and prevention of sports-related injuries, as well

as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those

who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of

injury from athletics participation."[5]

29.     The NCAA, therefore, holds itself out as both a proponent of and authority on the

treatment and prevention of sports-related injuries upon which NCAA athletes, including Gerald

Riedy, during his life, as well as schools like Pepperdine and Cal State Long Beach, could rely

on for guidance on player-safety issues.

30.     Gerald Riedy relied upon the NCAA's authority and guidance to protect his health

---

[5]          John T. Parsons, *2014-15 NCAA Sports Med. Handbook*, Nat'l Collegiate Athletic
Ass'n (Aug. 2014),
https://www.ncaa.org/sites/default/files/SMHB%20Mental%20Health%20INterventions.pdf.

and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life.

31.    As compared to Gerald Riedy, the NCAA was in a superior position to know of and mitigate the risks of sustaining concussions and other TBIs while playing football at Pepperdine and Cal State Long Beach. It failed to do so.

**II.    Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.**

32.    Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

33.    Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[6]

34.    To better understand the results of these studies, a brief introduction to concussions in football follows.

A.     An Overview of Concussions in Football.

35.    A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

36.    A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

37.    The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against

---

[6]    Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Sch. of Med. at USC, https://bit.ly/2MzSkkC (last visited Feb. 22, 2024).

the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

38.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

     i.     *Concussion Symptoms.*

39.     When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;
- memory loss;
- nausea or vomiting;
- headaches;
- blurred vision and sensitivity to light;
- slurred speech or saying things that do not make sense;
- difficulty concentrating, thinking, or making decisions;
- difficulty with coordination or balance;
- feeling anxious or irritable for no apparent reason; and
- feeling overly tired.

40.     A collegiate athlete may not recognize the signs and/or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.     *Post-Concussion Treatment.*

41.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly, including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

42.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

43.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

44.     Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate that the effects of concussions are anything but temporary.

B.     Studies Confirm the Dangers and Long-Term Effects of Concussions.

45.     Two of the leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the "tau protein."

46.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in ninety (90) of ninety-four (94) (96%) autopsied brains of former National Football League ("NFL") players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and forty-eight

(48) of fifty-three (53) former college players (91%).[7]

47.    These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

48.    Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all[,]" and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance.[8] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight[.]"

49.    Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[9] Similarly, the risks of concussions in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[10]

50.    Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs,

---

[7]    Jesse Mez, MD, MS, et al., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of Am. Football*, 318 JAMA 4, 360–370 (2017).

[8]    Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A System of Med., Vol. 8 231-32 (2d ed. 1910).

[9]    Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

[10]    Edward Nichols, *The Physical Aspect of Am. Football*, 154 Bos. Med. & Surgical J.1 (1906).

connect it to contact sports (including football), and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

51.    For instance, in 1927, Doctors Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[11] Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly fifty (50) percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[12]

52.    Countless studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor functions.[13] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[14]

53.    In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough

---

[11]    Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

[12]    Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[13]    *See, e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[14]    K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players.[15]

54.    The next year, the American Football Coaches Association published a report warning that players who suffer even "one concussion" should be removed from play.[16]

55.    In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[17]

56.    Starting in the late 1960s, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Doctors John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[18] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

57.    In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls whilst hunting or steeple chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can**

---

[15]    Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

[16]    Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion.").

[17]    Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[18]    John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

**cause it.**[19] (emphasis added).

58.    Overall, countless studies—published in prominent medical journals such as the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potentially dangerous long-term effects on brain function;
- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;
- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;
- with respect to head injuries in athletes who play contact sports, there is a relationship between neurologic pathology and the length of the athlete's career;
- immediate retrograde memory issues occur following concussions;
- head injuries require recovery time without risk of subjection to further injury;
- a football player who suffers a concussion requires significant rest before being subjected to further contact; and
- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials, and reduced speed of information processing.

59.    As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

60.    By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

61.    In 2003, an NCAA concussion study concluded that football players who had

---

[19]    J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion[,]" and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[20]

62.    Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

63.    Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of the safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

64.    Ultimately, while the NCAA knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, it ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including Gerald Riedy and other Pepperdine and Cal State Long Beach athletes. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

III.    **The NCAA Ignores the Dangers of Concussions and Fails to Implement Adequate Concussion Management Protocols and Requirements.**

65.    For decades, the NCAA has been aware—through its own institutional knowledge, internal research, and current medical science, among other sources of information—that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while Defendant knew about the harmful

---

[20]    Michael McCrea, et al., *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study*, The Journal of the Am. Med. Ass'n (Nov. 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Gerald Riedy.

66.    But as to college football, including Pepperdine's and Cal State Long Beach's football programs, the NCAA continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Gerald Riedy.

A.    <u>NCAA Fails to Adopt Any Concussion Protocols for Decades.</u>

67.    Since at least 1933, the NCAA has known of the serious nature of concussions and other head injuries in college football, and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

68.    The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that they "are in a category by themselves and warrant special attention[,]" as they "may be, and often are more severe in their immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players "should not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this[,]" and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

69.    The NCAA recognizes that its Sports Medicine Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral

obligation to make sure we do everything we can to protect and support student-athletes."

70.    Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.

71.    Rather than inform Gerald Riedy of these risks or implement protocols to protect and safeguard him from TBI-related injuries (as the NCAA promised to do through the NCAA Constitution, among other things), Defendant failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

72.    It was not until April 2010, under mounting public pressure, that the NCAA made some changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports. However, these changes were little more than a gesture that the NCAA had no plans to enforce, and were grossly insufficient for purposes of protecting football players.

## FACTS SPECIFIC TO GERALD RIEDY

73.    Gerald Riedy played football at Pepperdine University in 1961, during the final season of the school's football program. He also played football from 1962 to 1965 at Cal State Long Beach. At both schools, Riedy played the positions of Center, Guard, and one or more Tackle positions.

74.    Gerald spent the first part of his adult life working as an investment banker. For much of this period, Gerald was entirely normal in most respects: he held down a job, got married, and had children.

75.    Starting in his late forties, however, Gerald began to change. In particular, his

behavior became more erratic, including by making personal and business decisions that were, at best, incomprehensible to those who knew him best. He also divorced his wife of twenty-two (22) years.

76.    In 1997, Gerald moved to Arizona. His son, Plaintiff, would help care for him at various times during the remainder of his life, even as he began to descend further into delusions. He even began to believe that he had been exposed to Agent Orange while working for the Central Intelligence Agency during the Vietnam War, even though he never served in Vietnam and was working as an investment banker during the period in question. Plaintiff began living with Gerald full-time in 1999 until 2001, and then again beginning in 2010 until his death.

77.    Gerald ultimately died on October 7, 2018.

78.    Subsequently, tissue samples from Gerald's brain were sent to Boston University's Chronic Traumatic Encephalopathy Center in Boston, Massachusetts.

79.    In November 2019, a neuropathological assessment of Gerald's brain concluded that Gerald suffered from Stage II Chronic Traumatic Encephalopathy and Lewy Body dementia. The assessment concluded that his Parkinsonian symptoms were likely due to his dementia. Further, the report found that Gerald's "CTE can be attributed to his many years of football participation."

80.    During the time Gerald Riedy played college football, there were no adequate concussion management protocols or policies in place to address and treat concussions (to say nothing of repetitive sub-concussive impacts) sustained by student-athletes during practice and in games.

81.    In fact, although Gerald Riedy sustained repetitive serious blows to the head in practices and games, the NCAA failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on Pepperdine's or Cal State Long Beach's football teams. Each time Riedy suffered a blow to the head, Defendant deprived him of the appropriate medical attention and treatment that it knew was necessary to monitor,

manage, and mitigate the risks associated with TBIs.

82.    Such changes would have been easy to make and would have had profound impacts.[21]

83.    Had NCAA disclosed the truth to Gerald Riedy, he would have, at minimum, taken more precautions to protect his head and otherwise ensure his safety while playing.

84.    Indeed, had NCAA been honest with Gerald Riedy about the long-term consequences of taking repeated blows to the head while playing football, he would not have continued to play football at all.

85.    As a result of these injuries and NCAA's failure to adhere to a reasonable duty of care towards Gerald Riedy, he developed and died as a result of dementia and CTE.

### FIRST CAUSE OF ACTION
### Negligence (Wrongful Death)

86.    Plaintiff incorporates by reference the foregoing allegations.

87.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Gerald Riedy. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes.

88.    The duties of Defendant included specific obligations to supervise, regulate, and monitor the rules of its member universities' football programs and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain

---

[21]    *See, e.g.*, Lindsay Tanner, *Football Concussion Rates Plummet After One Simple Rule Change, Study Shows*, TIME (Oct. 2, 2018), https://www.yahoo.com/news/football-concussion-rates-plummet-one-145530797.html.

damage to member schools' football players, including Gerald Riedy.

89.    NCAA had a duty to educate student-athlete football players on the proper ways to evaluate and treat TBIs during football games and practices, including repetitive sub-concussive and concussive injuries. Defendant's duties further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries, of the risks associated with football before, during, and after they played college football, and as additional information came to light.

90.    NCAA also had a duty not to conceal material information from student-athlete football players, including Gerald Riedy.

91.    NCAA breached its duties owed to Gerald Riedy by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of concussions on the playing field, in the locker room, and in the weeks and months after he sustained concussions, as well as by failing to provide treatment for the latent effects of concussions. These failings included, but are not limited to:

(a)    failing to adequately recognize and monitor concussive and/or sub-concussive injuries during football practices and games;

(b)    failing to adequately inform Riedy of the dangers of concussive and/or sub-concussive injuries;

(c)    failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)    failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries; and

(e)    failing to adequately provide Riedy notification, warning, and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and/or sub-concussive injuries, after the time he left college.

92.    NCAA breached its duties to Gerald Riedy by failing to disclose, failing to recognize, and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma it possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Gerald Riedy.

93.    Gerald Riedy relied upon the guidance, expertise, and instruction of NCAA in understanding the risks associated with the serious and life-altering concussive and sub-concussive hits in football.

94.    At all times, Defendant had superior knowledge of material information regarding the effect of repeated traumatic head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to student-athlete football players, including Gerald Riedy, NCAA knew or should have known that they would act and rely upon the guidance, expertise, and instruction of Defendant on these crucial medical issues while attending college and thereafter.

95.    Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928, and explicitly connected to football by the NCAA itself not long after.

96.    In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing Alzheimer's disease, especially at an early age, as well as CTE.

97.    Gerald Riedy experienced repetitive head impacts during his college football career, which significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE and other similar cognitive-impairing conditions.

And Riedy did, in fact, develop dementia and CTE, which ultimately killed him.

98.    The repetitive head accelerations, hits, and TBIs to which Gerald Riedy was exposed as a student-athlete football player presented risks of latent and long-term debilitating chronic illnesses. Absent NCAA's negligence, the risk of harm to Gerald Riedy would have been materially decreased and Gerald Riedy would not have developed CTE or dementia.

99.    Thus, as a direct and proximate result of Defendant's negligence, Gerald Riedy died.

100.    As a result of its negligence, NCAA is liable to Plaintiff for the full measure of damages and other relief allowed under applicable law for causing the death of Gerald Riedy, including but not limited to the loss of Gerald Riedy's care, support, advice, companionship, and moral support.

## SECOND CAUSE OF ACTION
### Negligence (Survival Action)

101.    Plaintiff incorporates by reference the foregoing allegations.

102.    From its inception and by virtue of its role as the governing body in college athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Gerald Riedy. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes.

103.    The duties of NCAA included specific obligations to supervise, regulate, and monitor the rules of its member institutions' football programs and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to student-athlete football players, including Gerald Riedy.

104.    NCAA had a duty to educate student-athlete football players, including Riedy, on

the proper ways to evaluate and treat head injuries during and after football games and practices, including repetitive concussive and sub-concussive injuries. NCAA's duties further included a duty to warn athletes of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

105.    NCAA had a duty not to conceal material information from student-athlete football players, including Mr. Riedy.

106.    NCAA breached its duties owed to Gerald Riedy by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of concussions on the playing field, in the locker room, and in the weeks and months after he sustained concussions, as well as failing to provide treatment for the latent effects of concussions. These failings included, but are not limited to:

(a)    failing to adequately recognize and monitor concussive and/or sub-concussive injuries during football practices and games;

(b)    failing to adequately inform Riedy of the dangers of concussive and/or sub-concussive injuries;

(c)    failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)    failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries; and

(e)    failing to adequately provide Riedy notification, warning, and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and/or sub-concussive injuries, after the time he left college.

107.    NCAA breached its duties to student football players, including Mr. Riedy, by failing to disclose, failing to recognize, and/or being willfully non-observant of: (a) material

information regarding the long-term risks and effects of repetitive head trauma it possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Mr. Riedy.

108.    As a football player at Pepperdine and Cal State Long Beach, Mr. Riedy and those like him relied upon the guidance, expertise, and instruction of NCAA in understanding the risks associated with serious and life-altering concussive and sub-concussive hits in football.

109.    At all times, NCAA had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to student-athlete football players, including Mr. Riedy, NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending Pepperdine and Cal State Long Beach, and thereafter.

110.    Repetitive head impacts during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

111.    In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially at an early age.

112.    Student-athletes, including Mr. Riedy, experienced repetitive concussive and sub-concussive impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, and Mr. Riedy did, in fact, develop CTE and dementia.

113.    The repetitive head accelerations and hits to which student-athletes, including Mr. Riedy, were exposed to presented risks of latent and long-term debilitating chronic illnesses. Absent NCAA's negligence, the risk of harm to Mr. Riedy would have been materially decreased, and he would not have developed debilitating physical and mental health issues prior to his death.

114.    As a direct result of NCAA's negligence, prior to the time of his death, Mr. Riedy incurred economic and non-economic damages in the form of pain and suffering, permanent brain damage, medical costs, care expenses, other out of pocket expenses, lost time, lost earnings, and a significant loss of enjoyment of life. As a result, Defendant is liable to Plaintiff for the full measure of damages allowed under applicable law for causing these harms to Gerald Riedy through its negligence.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Thomas Riedy, as Personal Representative to Gerald Riedy respectfully requests that the Court enter an Order providing for the following relief:

A.    Declare that Defendant's actions, as set out above, constitute negligence and caused the wrongful death of Gerald Riedy;

B.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendant's conduct, including, without limitation, damages for past medical expenses, other out of pocket expenses, lost time and interest, lost earnings, death, and other damages;

C.    Award Plaintiff restitution and/or disgorgement of all monies Defendant has unjustly received as a result of its misconduct alleged herein;

D.    Award Plaintiff reasonable litigation expenses and attorneys' fees;

E.    Award Plaintiff pre- and post-judgment interest, to the extent allowable;

F.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff; and

G.    Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**THOMAS RIEDY**, as Personal Representative of
Gerald Riedy, deceased,

Dated: March 18, 2024          By: /s/ Jeff Raizner

*One of Plaintiff's Attorneys*

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street, Suite 300
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff*

*Pro hac vice* Admission to be sought.